**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
ERIC HOWARD GREENBERG,

                Plaintiff,

    -against-

AMERIPRISE FINANCIAL SERVICES, INC.,
RICHARD EVAN LEVINE, and LEVINE &
ASSOCIATES,

                Defendants.
----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
15-cv-3589 (ADS) (AYS)

**APPEARANCES:**

**Baruch S. Gottesman, Esq.**
*Attorney for the Plaintiff*
185-12 Union Turnpike
Fresh Meadows, NY 11366

**Horowitz and Rubenstein, LLC**
*Attorneys for the Plaintiff*
200 South Service Road, Suite 104
Roslyn Heights, NY 11577
    By: E. Alan Rubenstein, Esq., Of Counsel

**Carlet, Garrison, Klein & Zaretsky, L.L.P.**
*Attorneys for the Defendants*
1135 Clifton Avenue
Clifton, NJ 07013
    By: Virginia T. Shea, Esq., Of Counsel

**Chorpenning, Good, Carlet & Garrison, Esqs.**
*Attorneys for the Defendants*
623 Fifth Avenue, 24th Floor
New York, NY 10022
    By: Michael J. Zaretsky, Esq., Of Counsel

**SPATT, District Judge**.

This case arises from a March 30, 2007 letter written by the Defendant Richard E. Levine ("Levine") to the Florida Department of Insurance regarding the purported attempt by the Plaintiff Eric H. Greenberg (the "Plaintiff") to setup a fraudulent life insurance scheme and solicit Florida residents to participate in this fraudulent scheme. The Plaintiff alleges that the letter was false and defamatory and caused him to lose his job as a financial advisor and suffer reputational and economic damages.

On May 20, 2015, the Plaintiff filed a complaint in the Supreme Court of the State of New York, Nassau County, against the Defendants Ameriprise Financial Services, Inc. ("Ameriprise"), Levine, and Levine & Associates (collectively, the "Defendants"), alleging state tort law claims for defamation, tortious interference with contract, and tortious interference with prospective economic relations.

On June 19, 2015, the Defendants timely removed the action to this Court pursuant to 28 U.S.C. §§ 1441(b) and 1446 on the basis of diversity of citizenship.

Presently before the Court is a motion by the Defendants pursuant to the Federal Arbitration Act, 9 U.S.C. 1, *et seq.* (the "FAA"), to compel arbitration and stay this action.

For the reasons set forth below, the Defendants' motion is granted.

## I. BACKGROUND

The Plaintiff is a New York citizen and maintains his principal place of business in Nassau County. (Compl. at ¶ 1.)

The Defendant Ameriprise is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. (Notice of Removal at ¶ 5.) It is a "broker-dealer" and member of the Financial Industry Regulatory Authority ("FINRA"). (Rustad Decl. at ¶ 4.) FINRA is a

"self-regulatory organization authorized by federal law to perform certain regulatory functions as to the securities industry."  (Id. at ¶ 3.)

The Defendant Levine is a Georgia citizen.  (Notice of Removal at ¶ 6.)  He is a financial advisor affiliated with Ameriprise.  (Rustad Decl at ¶ 4.)

The Defendant Levine & Associates is a marketing designation under which Levine conducts his financial advisory practice with Ameriprise. (Id. at ¶ 6.)  It is not a separate legal entity.  (Id.)

Beginning about 1990, the Plaintiff began practicing as a "finance industry professional." (Compl. at ¶ 9.)  To that end, the Plaintiff obtained a Series 3 license permitting him to trade in commodities; a Series 55 license permitting him to trade in equities; and a license from the New York State Insurance Department to sell life insurance.  (Id. at ¶¶ 9–13.)  The Plaintiff also alleges that as a financial services professional he was "subject to self-regulation through FINRA."  (Id. at ¶ 17.)

Allegedly from 1990 to 2007, the Plaintiff had an "excellent reputation in the financial services industry" and was never investigated by FINRA or any other relevant regulatory agency "for fraud, illegality, or non-compliant behavior."  (Id. at ¶ 15.)

In 2007, the Plaintiff had contracts to provide services for Woodbury Financial Services, Inc. ("Woodbury"), U.S. Planning Group, "various life insurance companies, and Errors and Omissions insurance companies."  (Id. at ¶ 18.)  The complaint does not state the terms of these contracts or make clear what services the Plaintiff agreed to provide for these companies.

On March 30, 2007, the Defendant Levine wrote a letter to the Florida Department of Insurance to report an apparent illegal insurance scam undertaken by the Plaintiff.  (Compl., Ex. A.)  According to the letter, in about February 2007, the Plaintiff approached Levine's parents

and a number of other couples in their mid-70s living in Boynton Beach, Florida, and asked them to attend a meeting regarding life insurance.  (Id. at 1.)  In late February 2007, the Plaintiff held a meeting in the Cascades subdivision in Boynton Beach, which Levine's parents attended, and allegedly offered them, as well as the other attendees, an opportunity to take part in a "money for nothing" life insurance plan whereby (i) each couple would take out one or multiple life insurance policies based on estimates far in excess of their net worth; (ii) the couple would then transfer title to that policy or policies to a trust run by the Plaintiff and his associates, which would cover the premium payments on the policy; and (iii) the Plaintiff would then sell the policy in the secondary market to a life insurance settlement company for a fraction of what the policy was worth to turn a quick profit.  (See id.)  Using this method, the Plaintiff purportedly promised that "each couple would receive somewhere in the neighborhood of $250,000 if they would agree to take out a $2 million policy on the older person in each couple."  (Id.)

According to Levine, one couple at the meeting "asked how they would get approved for a $2 - $5 million policy when they are worth less than $1 million, [the Plaintiff] said that [they] could simply put his name down on the application as their 'financial advisor' and he would verify they had sufficient assets and income to warrant such a policy." (Id.)  Another couple allegedly asked how a life insurance policy could change hands so quickly, and the Plaintiff apparently responded, "[T]he insurance company would never know the policy changed hands since it would still be owned by the same trust and only the beneficiary of the trust would change." (Id.)

In his letter to the Florida Department of Insurance, Levine wrote that he had a "number of concerns" with the Plaintiff's proposition.  First, he stated that "[a]ccording to the Florida Department of Financial Services website, it would not appear that [the Plaintiff] is licensed to

solicit insurance business in the state of Florida." (Id. at 2.) Second, he noted that the Plaintiff's proposed strategy "appears to be Stranger Initiated Life Insurance" and that there "doesn't appear to be any insurable interest or legitimate intent in taking out these policies other than for the purpose of immediate resale to investors and to 'make money for nothing,' as the Plaintiff explained." (Id.) Third, Levine stated that the Plaintiff offered no business card, brochure, or stationary bearing his name. (Id.) Instead, he gave the attendees a generic letter bearing the name of Marc Cohen, his alleged superior at the U.S. Planning Group. (Id.) According to Levine, the Plaintiff was then listed on the National Association of Securities Dealers ("NASD"), the predecessor organization to FINRA, as being employed by the U.S. Planning Group. (Id.)

Finally, Levine purportedly attached information regarding the Plaintiff in his letter and asked that the recipient at the Florida Department of Insurance "maintain the confidence of []his claim." (Id. at 3.)

In the complaint, the Plaintiff denies the substance of the allegations set forth in the March 30, 2007 letter, alleging that he never held an insurance seminar; did not "entice seniors to attend a seminar at his parents' home"; and "did not solicit insurance applications in Florida." (Compl. at ¶¶ 52–56.)

In the Summer of 2007, allegedly as a "direct and proximate cause of the false allegations published by [the] Defendants, [the] Plaintiff was discharged by Woodbury [] for cause.' (Id. at ¶ 70.)

Also, the Plaintiff alleges that as a result of his termination, FINRA disclosed the incident on its public database. To that end, the Plaintiff attaches to the complaint, a "brokercheck report" run on the FINRA database, which is dated May 20, 2015. (See Compl., Ex. B.) According to the report, the Plaintiff is "not currently registered" with FINRA but had been

previously registered as associated with Legend Securities, Inc., World Equity Group, Inc., and Woodbury. (See id. at 1.) Relevant here, the Report discloses that the Plaintiff was discharged by Woodbury on July 19, 2007 for "unlicensed activity" based on allegations that the Plaintiff "conducted an insurance seminar in Florida without being licensed in the State." (Id. at 7.). Also included in this disclosure is the following statement authored by the Plaintiff:

> I have never been notified in writing or contacted by Florida in relation to this. I was in Florida during the beginning of 2007 for a party celebrating my parents['] fity [sic] year wedding anniversary. I had the opportunity to see many people who have known me since childhood . . . . They inquired about my wife, four children, etc . . . . In general terms I explained to them about my enterance [sic] into the insurance business. To this day I have never been paid by a brokerage firm nor an insurance company for any business. I have never even submitted an application for either. This accusation has prevented me from attempting to begin my new career.

(Id. at 8.)

According to the complaint, the March 30, 2007 letter also interfered with the performance of the Plaintiff's contract with the U.S. Planning Group. (Compl. at ¶ 75.) He also alleges that the letter disrupted other contracts that the Plaintiff had with unspecified third parties. (Id. at ¶ 77.)

On May 27, 2014, the Plaintiff's colleague obtained a copy of the March 30, 2007 letter in discovery in an unrelated investigation and emailed it to the Plaintiff. (Id. at ¶ 83–85.) Until that point, the Plaintiff allegedly had "no knowledge of the [letter], its author, or its existence." (Id. at ¶ 78.)

On June 19, 2015, the Plaintiff commenced this action, asserting claims against the Defendants for (i) defamation arising from the allegedly false statements made by Levine in the March 30, 2007 letter; (ii) tortious interference with the Plaintiff's contracts with Woodbury and

the U.S. Planning Group; and (iii) tortious interference with the Plaintiff's ability to sell life insurance to prospective clients. (See id. at ¶¶ 89–110.)

As noted, presently before the Court is a motion by the Defendants pursuant to the FAA to compel arbitration and to stay this action pending the outcome of the arbitration.

## II. DISCUSSION

### A. The Legal Standard

"The Supreme Court has repeatedly instructed that the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 et seq., first enacted in 1925, 'embod[ies] a national policy favoring arbitration.'" Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012) (quoting AT&T Mobility LLC v. Concepcion, ––– U.S. ––––, 131 S. Ct. 1740, 1749, 179 L.Ed.2d 742 (2011)); see also Marmet Health Care Ctr., Inc. v. Brown, 132 S. Ct. 1201, 1203, 182 L. Ed. 2d 42 (2012) (Per Curiam) ("[The FAA] "reflects an emphatic federal policy in favor of arbitral dispute resolution."") (quoting KPMG LLP v. Cocchi, 565 U.S. ––––, ––––, 132 S.Ct. 23, 25, 181 L.Ed.2d 323 (2011)).

To that end, FAA § 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

In order to determine whether all or part of an action should be sent to arbitration, the Second Circuit has instructed district courts to conduct the following inquiries:

[F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004) (quoting Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 75–76 (2d Cir. 1998)).

The Plaintiff does not assert any federal statutory claims. Therefore, the Court need not address the third inquiry and instead focuses on whether (i) the FAA applies; (ii) whether the parties entered into an arbitration agreement; (iii) if so, whether the Plaintiff's claims fall under the scope of that agreement;

## B. As to the Whether the FAA Applies

As an initial matter, the Court must determine whether the FAA or New York State law applies to answering the question of whether the parties agreed to arbitrate this dispute.

The FAA applies to any "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. In that regard, "[t]he Supreme Court has clearly held that the Arbitration Act applies in federal court to diversity suits which relate to contracts involving interstate or international commerce." David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 249 (2d Cir. 1991) (alteration added) (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402, 87 S. Ct. 1801, 1805, 18 L.Ed.2d 1270 (1967)).

In the present case, as explained below, the Defendants assert that the Plaintiff agreed to arbitrate disputes with other FINRA "members" and "associated persons" when he registered as an "associated person" with FINRA. The Defendants further assert — and the Plaintiff does not appear to dispute — that the Plaintiff's agreement to arbitrate disputes under FINRA involves

commerce because the parties are diverse; the Defendants' alleged actions took place in Florida and Georgia; and allegedly affected the Plaintiff's business in New York. (See the Defs.' Mem. of Law at 5; see also the Pl.'s Mem. of Law at 5.)

In light of the diversity of citizenship of the parties and the events giving rise to the present dispute, the Court agrees with the Defendants that this action concerns interstate commerce. Therefore, the FAA applies to this case. See SOHC, Inc. v. Zentis Sweet Ovations Holding LLC, No. 14-CV-2270 (JMF), 2014 WL 5643683, at *3 (S.D.N.Y. Nov. 4, 2014) ("It is well-settled that the [FAA] applies where federal subject matter jurisdiction is predicated upon diversity and where the contract calling for arbitration concerns a transaction involving interstate commerce.") (alterations in original) (parenthetically quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Shaddock, 822 F. Supp. 125, 131 (S.D.N.Y. 1993)); see also Aviall, Inc. v. Ryder Sys., Inc., 913 F. Supp. 826, 830 (S.D.N.Y. 1996) (applying the FAA because "[t]his case undeniably falls within the interstate commerce prong of FAA § 2 and the parties do not dispute its applicability.").

**C. As to Whether the Parties Agreed to Arbitrate**

Having determined that the FAA applies, "[t]he threshold question facing any court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate." Schnabel, 697 F.3d at 118. "In the context of motions to compel arbitration brought under the [FAA] . . . , the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). Specifically, "a trial is warranted only if there exists one or more genuine issues of material fact regarding whether the parties have entered into such an agreement." Schnabel, 697 F.3d at 118.

"'[T]he question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator.'" Schnabel, 697 F.3d at 118. In making that determination, "[t]he Court may properly consider documents outside of the pleadings." Brown v. Coca-Cola Enterprises, Inc., No. 08-CV-3231 (JFB) (ETB), 2009 WL 1146441, at *1 n.1 (E.D.N.Y. Apr. 28, 2009); see also BS Sun Shipping Monrovia v. Citgo Petroleum Corp., No. 06 CIV. 839 (HB), 2006 WL 2265041, at *3 (S.D.N.Y. Aug. 8, 2006) ("While it is generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration.").

In the present case, the Defendants assert that the Plaintiff entered into an agreement to arbitrate disputes with the Defendants when he registered with FINRA as securities broker associated with Woodbury. (See the Def.'s Mem. of Law at 3.) That is because, prior to registering with FINRA, an individual or entity must sign a FINRA Form U-4, in which they "agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or *any other person*, that is required to be arbitrated under the rule, constitution, or by-laws of [FINRA]." (Rustad Decl., Ex. B, at § 15(5) (emphasis added)). Thus, by registering with FINRA, the Defendants contend that the Plaintiff agreed to arbitrate any dispute that is required to be arbitrated under the FINRA Code of Arbitration Procedure (the "FINRA Code").

In this respect, the Defendants' position is supported by well-established precedent. See UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc., 660 F.3d 643, 648-49 (2d Cir. 2011) ("Upon joining FINRA, a member organization agrees to comply with FINRA's rules . . . . As a FINRA member, therefore, UBS is bound to adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein."); Valentine Capital Asset Mgmt.,

Inc. v. Agahi, 174 Cal. App. 4th 606, 613, 94 Cal. Rptr. 3d 526, 532 (Cal. App. 2009) ("Before

engaging in activities as a registered representative for a FINRA-member firm, all registered

representatives of broker-dealers, investment advisors, and securities issuers must sign a

'Uniform Application for Securities Industry Registration or Transfer,' commonly referred to as

Form U–4.").

    For his part, the Plaintiff assumes for purposes of this motion that he entered into an

agreement to arbitrate disputes according to the FINRA Code, though he purports to reserve "the

right to challenge the alleged existence of the arbitration agreement at the appropriate time after

discovery." (The Pl.'s Mem. of Law at 6.) He also points out that the Defendants have not

offered a copy of the Form U-4 that the Plaintiff signed. (Id.) Thus, he suggests in passing that

there may be some doubt as to whether he did in fact agree to be bound by the FINRA Code.

    However, "it is not sufficient for the party opposing arbitration to utter general denials of

the facts on which the right to arbitration depends." Oppenheimer & Co. v. Neidhardt, 56 F.3d

352, 358 (2d Cir. 1995). Rather, where, as here, "the party seeking arbitration has substantiated

the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but

must submit evidentiary facts showing that there is a dispute of fact to be tried." Id.

    The Plaintiff has not submitted any evidence to rebut the Defendants' showing, supported

by sworn declarations, that he was required to sign a Form U-4 as a pre-condition to registering

with FINRA. Thus, the Court does not find that the Defendants' failure to produce a Form U-4

signed by the Plaintiff creates a genuine issue of fact as to whether the Plaintiff agreed to

arbitrate disputes according to the terms of the FINRA Code, as the Plaintiff appears to suggest.

See Valentine Capital Asset Mgmt., Inc., 174 Cal. App. 4th at 615 (rejecting a plaintiff's

argument that the defendants' motion to compel should be denied "due to the absence of

evidence of signed Form U-4s" because "there is no genuine dispute that John Valentine and the

Agahi Defendants did, in fact, sign a Form U–4 and are, in fact, "associated persons" within the

meaning of FINRA. Attached to Ortale's Declaration was a purported printout of Valentine's

then-current registrations and SROs, indicating registration with FINRA. Valentine did not

dispute the fact of his registration or suggest any way he could have registered without signing

Form U–4.")

Accordingly, the Court finds that the FINRA Code governs the question of whether the

Plaintiff's claims are subject to arbitration.

**D. As to the Scope of the Parties' Agreement to Arbitrate**.

Having determined that the Plaintiff agreed to be bound by the FINRA Code, the Court

will now address whether his claims fall within the scope of FINRA's arbitration provisions.

In interpreting the FINRA Code, the FAA "'requires courts to enforce privately

negotiated agreements to arbitrate, like other contracts, in accordance with their terms.'" UBS

Fin. Servs., Inc., 660 F.3d at 649 (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford

Junior Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).  However, unlike

interpreting traditional terms of a contract, "doubts concerning the scope of an arbitration clause

should be resolved in favor of arbitration." Applied Energetics, Inc. v. NewOak Capital Markets,

LLC, 645 F.3d 522, 526 (2d Cir. 2011).  "This principle is based upon the fact that the FAA is an

expression of 'a strong federal policy favoring arbitration as an alternative means of dispute

resolution.'" JLM Indus., Inc, 387 F.3d at 171 (quoting Hartford Accident & Indem. Co. v. Swiss

Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001)).

As relevant here, Rule 13200 of the FINRA Code states:

(a) Generally

Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:

- Members;
- Members and Associated Persons; or
- Associated Persons

(b) Insurance Activities

Disputes arising out of the insurance business activities of a member that is also an insurance company are not required to be arbitrated under the Code.

(Rustad Decl., Ex. C) (emphasis added).

Rule 13100 defines a "member" as "any broker or dealer admitted into membership in FINRA, whether or not the membership has been terminated or cancelled." (Id.) "Associated person" means "a person associated with a member." (Id.) The Code does not define "business activities."

Accordingly, in determining whether the Plaintiff's claims fall within the scope of Section 13200(a), the court must answer two questions: (i) can the Plaintiff's claims be categorized as a dispute between "members and associated persons"; and (ii) does the dispute in this case "arise out of the business activities of a member or an associated person?"

The answer to the first question is relatively straightforward. As discussed earlier, the Plaintiff acknowledges in the complaint that he had registered with FINRA as a securities broker for Legend Securities for the period January 2011 to August 2011; World Equity Group, Inc. from May 2008 to April 2009; and Woodbury from February 2007 to July 2007. (See Compl., Ex. C.)

Although the Plaintiff's FINRA registration was cancelled in August 2011, courts have held that individuals still maintain their status as "associated persons" subject to the FINRA Code so long as they were registered with FINRA at the time the material events giving rise to

the dispute took place. See Christensen v. Nauman, 73 F. Supp. 3d 405, 411 n.4 (S.D.N.Y. 2014) ("That KCCI terminated its FINRA registration on December 31, 2013 does not prevent it from pursuing FINRA arbitration. KCCI (and its associated persons) are 'subject to the FINRA arbitration requirement as long as its membership ha[d] not been terminated or cancelled prior to the material events giving rise to the dispute.'") (quoting Metro. Life Ins. Co. v. Puzzo, No. 13 Civ. 3858(TWT), 2014 WL 1817636, at *2 (N.D. Ga. May 6, 2014)); see also Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. CV-11-4934 (LDW), 2012 WL 760564, at *2 (E.D.N.Y. Mar. 8, 2012) ("In the absence of any agreement to the contrary, they are therefore bound to arbitrate any dispute arising out of their business relationship. The subsequent cancellation of Plaintiff s broker dealer status does not change the court's conclusion.").

Here, as discussed in more detail below, the Plaintiff's claims are premised on Levine's March 30, 2007 letter to the Florida Department of Insurance and its effect on the Plaintiff's business. Because it is undisputed that the Plaintiff was registered as a person associated with Woodbury from February 2007 to July 2007, during the period when Levine sent the March 30, 2007 letter, it is clear that the Plaintiff is an "associated person" for purposes of Rule 13200(a).

It is also undisputed that the Defendant Ameriprise is a "member" of FINRA and that the Defendant Levine is registered with FINRA as a broker for Ameriprise. (Rustad Decl. at ¶¶ 4–5.) Thus, the Plaintiff's claims against Ameriprise and Levine can be described as a dispute between an "associated person" (i.e., the Plaintiff") and an "associated person" (i.e. Levine) and a "member" (i.e. Ameriprise).

The legal status of Levine & Associates is somewhat vague. The Defendants assert — and the Plaintiff does not dispute — that Levine & Associates is not a separate legal entity but rather a "marketing designation under which Levine conducts his financial advisory practice with

Ameriprise[.]" (Rustad Decl. at ¶ 6.) Thus, although Levine & Associates does not appear to have registered with FINRA, the Plaintiff's claims against it are entirely derivative of his claims against Levine and Ameriprise, who are both registered with FINRA and subject to Rule 13200(a). Under these circumstances, the Court sees no reason to analyze the Plaintiff's claims against Levine & Associates differently than Levine or Ameriprise for purposes of arbitration, particularly where the Plaintiff does not treat the Defendants differently in his complaint or in his legal arguments in opposition to the Defendants' present motion.

Accordingly, the Court finds that it is undisputed that the Plaintiff's claims are between and among "associated persons" and "members" registered with FINRA.

The answer to the second question, — namely, whether the Plaintiff's claims "arise out of the business activities of a member or an associated person" — is less straightforward.

The Plaintiff asserts that his claims do not "arise out of the business activities of a member or an associated person" because his claims against the Defendants for defamation, tortious interference with contract, and tortious interference with prospective of economic relations, are premised on the theory that he did not engage in the illegal insurance practices outlined in the March 30, 2007 letter from Levine to the Florida Department of Insurance. (See id.)

In reply, the Defendants assert that the Plaintiff's claims do arise out of his "business activities" as an "associated person" because the "defamation allegations may require the presentation of evidence as to whether [the] Plaintiff acted as stated in Levine's letter, and the impact of the letter on the Plaintiff's business." (The Defs.' Reply Mem. of Law at 6.) In addition, the Defendants contend that Levine wrote the March 30, 2007 letter as part of his duties

as a financial advisor, and therefore, the Plaintiff's claims also arise out of the Defendants' "business activities."  (<u>Id.</u> at 7.)

The Second Circuit has not directly addressed the meaning of the language, "arise out of the business activities of a member or associated person."  However, the Court is mindful that because the FAA applies to this case, there is a "federal policy favoring the liberal enforcement of arbitration clauses[.]"  <u>Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.</u>, 369 F.3d 645, 654 (2d Cir. 2004).  In light of this policy, the Second Circuit has interpreted the language, "arise out of," in arbitration clauses broadly to mean, "If the allegations underlying the claims 'touch matters' covered by the parties' . . . agreements, then those claims must be arbitrated."  <u>Id.</u> (quoting <u>Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l Inc.</u>, 198 F.3d 88, 99 (2d Cir. 1999)); <u>see also</u> <u>Genesco, Inc. v. T. Kakiuchi & Co.</u>, 815 F.2d 840, 846 (2d Cir. 1987) (interpreting the language in an arbitration clause that claims that "arise under" or "relate to" the underlying sales agreements must be arbitrated to mean "[i]f the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them.").

Applying this reading of "arise out of" to Rule 13200(a), the Court finds that any of the Plaintiff's claims which "touch upon" *either* the Plaintiff's or the Defendants' "business activities" as FINRA "members" or "associated persons" must be arbitrated.

In reviewing the allegations underlying the Plaintiff's claims, it is clear that those claims do at the very least touch upon the Plaintiff's "business activities" as an "associated person." The Plaintiff asserts defamation and intentional interference claims against the Defendants and alleges that the statements made by Levine in the March 30, 2007 letter to the Florida Department of Insurance were false and malicious. (<u>See</u> Compl. at ¶¶ 32, 38–47, 48–65.)

However, of importance, the Plaintiff's claims are also premised on the effect that the March 30, 2007 letter had on his business, including causing Woodbury to terminate his contract, and resulting in the loss of his current client, U.S. Planning Group, and prospective future clients. (See id. at ¶¶ 29, 30, 73–77.).

Accordingly, the fact that the Plaintiff denies that he actually engaged in the improper insurance activities described in Levine's March 30, 2007 letter does not, as the Plaintiff contends, mean that his claims do not "touch upon" his "business activities" for two reasons.

First, the parties dispute whether the accusations in the March 30, 2007 letter were true and therefore, a trial of his tort claims will necessarily entail an inquiry into the Plaintiff's "business activities" for Woodbury, a FINRA "member"; whether Woodbury authorized him to solicit life insurance in Florida; whether the Plaintiff did in fact solicit life insurance in Florida; and if so, whether that was outside the scope of his relationship with Woodbury. All of these questions "touch upon" the Plaintiff's "business activities" as an "associated person."

Second, the damages asserted by the Plaintiff with respect to both his defamation and intentional interference claims rest on allegations that the March 30, 2007 letter harmed his "business activities" as a broker registered with FINRA. Indeed, he attaches to his complaint a disclosure filed by Woodbury with FINRA regarding the March 30, 2007 letter as evidence of the harm to the Plaintiff's reputation in the financial industry caused by Levine's accusations. Thus, even assuming that he proves that the accusations in the March 30, 2007 letter were false, the Plaintiff will have to show the harm to his reputation and his existing/prospective clients caused by publishing the letter. In this respect, the underlying allegations also "touch upon" the Plaintiff's "business activities" and therefore, do fall within the scope of Rule 13200(a).

The Court's finding is buttressed by several district court cases. In Kouromihelakis v. Hartford Fire Ins. Co., 48 F. Supp. 3d 175 (D. Conn. 2014), the defendant filed a public disclosure with FINRA after the plaintiff was terminated alleging that the plaintiff forged a document when he worked for the defendant. Id. at 179. The court granted the defendant's motion to compel arbitration of the plaintiff's defamation claim because, "the underlying dispute in the defamation claim is whether the plaintiff forged a document in January 2011 while he was employed by the defendant." Id. at 185. Thus, the court found that the dispute fell "squarely within the scope of FINRA Rule 13200(a) because it 'arises out of the business activities' between the parties." Id. (alteration added);

Similarly, in Hawkins v. Questar Capital Corp., No. 5:12-CV-000376, (KSF) 2013 WL 5596897, at *1 (E.D. Ky. Oct. 11, 2013), the plaintiff, a securities broker, asserted intentional interference with contract and intentional interference with economic opportunity claims against his former employer for "sharing confidential information" with a pre-existing client of the plaintiff's, causing the client to terminate its relationship with the plaintiff. Id. The court rejected the plaintiff's argument that the plaintiff's intentional interference claims did not "arise out of the business activities" of the plaintiff or the defendant for purposes of Rule 13200(a) because the defendant's allegedly tortious conduct occurred after the plaintiff left his employment with the defendant. Id. at *4. The court reasoned, "Rule 13200 does not require the arbitration of disputes that arise only from contracts between Members and/or Associated Persons, nor does the Rule contain any time limitation provisions. Rather, the Rule broadly provides that any dispute that 'arises out of the business activities of a member or an associated person' must be arbitrated." Id. The court found that the plaintiff's interference claims did arise out of the plaintiff's "business activities" because the plaintiff alleged that the defendants'

actions in "sharing confidential information" with the plaintiff's former client caused the plaintiff "serious financial losses" and affected his "future economic opportunities" and "future earnings." Id.

Likewise, in this case, underlying the Plaintiff's defamation and intentional interference claims is not only the alleged falsity of the accusations in the March 30, 2007 letter, but also the alleged affect that the letter had on the Plaintiff's "business activities" and associations with FINRA "members" — namely, Woodbury terminated its relationships with the Plaintiff, and the Plaintiff was unable to continue selling life insurance on behalf of other FINRA "members." Therefore, like the plaintiffs' claims in Kouromihelakis and Hawkins, the Plaintiff's claims clearly do "touch upon" the Plaintiff's "business activities" as an "associated person."

The Court does not find that the two cases relied on by the Plaintiff — Valentine Capital Asset Mgmt., Inc. v. Agahi, supra, and Seruma v Wiersum, 2011 N.Y. Misc. LEXIS 6934 (N.Y. Sup. Ct. Sept. 9, 2011) — to be analogous.

In Valentine, a California State Appeals Court denied the defendants' motion to compel arbitration under Rule 13200(a) of the plaintiff's claims against them for misappropriation of trade secrets, intentional interference with contract relations and economic advantage, and defamation claims, as well as the defendants' cross-claims for defamation and slander. 174 Cal. App. 4th at 610. Central to the court's finding that the parties' claims did not arise from the plaintiff or the defendants' "business activities" was the fact that none of the parties were registered with FINRA as "associated persons" with the plaintiff's firm at the time that they misappropriated the plaintiff's trade secrets; rather, they were registered as associated with another firm that was not a party to the action. See id. at 609. Thus, "[n]one of the purported wrongdoing in either pleading is alleged to have occurred in the course of the parties' duties as

19

associated persons with a FINRA-member firm; instead, it allegedly occurred in connection with investment advisory firms (such as VCAM, VWM, and predecessors, and perhaps Horizon) who are not members of FINRA." Id. at 618. Thus, the court did not find the requisite nexus between the underlying allegations and the "business activities" of the parties as associated with FINRA "members." See id.

Similarly, in Seruma, the New York State Supreme Court granted a plaintiff's application to stay claims against an executive employed by his former employer for fraudulent inducement from being arbitrated pursuant to Rule 13200(a). 2011 N.Y. Misc. LEXIS 6934. In that case, as in Valentine, while both parties were registered as "associated persons" under FINRA, they were not associated with the plaintiff's former employer, which was not a FINRA "member," but rather with other FINRA "members" who were not involved in the case. See id. at *5. Therefore, because the case concerned the actions of the parties on behalf of a company that was not a FINRA "member", the court did not find that the plaintiff's fraud claim related to the "business activities" of a FINRA "member." See id. at *9. The court reasoned that "[a]ny other interpretation of Rule 13200, would require . . . . FINRA arbitration of any claim for property damage arising out of an automobile accident between taxi cabs being driven by petitioner and respondent while both were moonlighting as taxi cab drivers. FINRA arbitration is not mandated in every case merely because the dispute involves 'business activities' of any sort between two associated members of FINRA, however attenuated from FINRA regulated activities." Id. at *9–10.

In this case, it is not entirely clear whether the Plaintiff was acting on behalf of a FINRA "member," as opposed to acting for his own benefit, when he was allegedly holding a life insurance seminar in Florida with Levine's parents and other individuals. However, unlike in

<u>Seruma</u> and <u>Valentine</u>, it is clear that the accusations concerning his alleged improper activities had a direct effect on his relationship with Woodbury, a FINRA "member," as well as his future opportunities to work on behalf of other FINRA "members." Thus, the allegations in the complaint do not concern a side business unaffiliated with FINRA, as was the case in <u>Seruma</u> and <u>Valentine</u>, but concern his core "business activities," his status as a securities broker, and his affiliations with FINRA "members." Thus, the connection between the Plaintiff's allegations and FINRA members is not attenuated and does "touch upon" the Plaintiff's "business activities" as an "associated person."

Furthermore, the Court notes that even if it found some ambiguity in the facts concerning the Plaintiff's association with a FINRA "member," it is required to construe that ambiguity in favor of arbitration under the well-worn policy of the FAA. <u>See</u> <u>Genesco, Inc.</u>, 815 F.2d at 848 ("Examining the complaint and bearing in mind that ambiguities in scope should be resolved in favor of coverage, . . . , particularly in the international context, . . . we conclude that Genesco's RICO claim against Kakiuchi–Japan 'arises under' the parties' sales agreements.") (internal citations omitted); <u>Kouromihelakis v. Hartford Fire Ins. Co.</u>, 48 F. Supp. 3d at 183 ("Therefore, in light of the . . . principle that doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, the court concludes that Counts One and Two fall within the scope of the arbitration agreement between the parties.").

For these reasons, the Court finds that the Plaintiff's claims do fall within the scope of Rule 13200(a) and are therefore, subject to arbitration.

In the alternative, the Plaintiff asserts that his claims fall under the exception to arbitration enumerated in Rule 13200(b), which states, "Disputes arising out of the insurance business activities of a member that is also an insurance company are not required to be

arbitrated under the Code." As discussed earlier, it is undisputed that the Plaintiff and Levine are "associated persons," not "members" of FINRA. It is also undisputed that Levine & Associates is not a "member" or an "associated person" registered with FINRA. The only party who is a "member" of FINRA is Ameriprise, and the Defendants submit a sworn declaration from Rustad, a Vice President of Compliance at Ameriprise, stating that it is not an insurance company. (Rustad Supp. Decl. at ¶ 2.)

In response, the Plaintiff states that he "understand[s] that [the] Defendants are both insurance companies under the relevant law and for purposes of the FINRA Code." (The Pl.'s Mem. Law at 11.) However, he offers no affirmative evidence, such as a sworn declaration, to support this assertion. Nor does he offer any legal authority to support his contention that the Defendants are "insurance companies under relevant law." Therefore, the Court cannot find a dispute of fact as to whether Ameriprise is an insurance company for purposes of Rule 13200(b). As there is no non-conclusory allegation or evidence in this case showing that a party is an insurance company, the Court finds that the plain language of Rule 13200(b) does not cover the Plaintiff's claims.

In sum, the Court finds that the Plaintiffs claims are subject to arbitration under Rule 13200(a) and therefore, grants the Defendants' motion to compel arbitration.

Section 3 of the FAA provides that "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, [the court] shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Therefore, "by its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration

agreement has been signed." In re A2P SMS Antitrust Litig., 972 F. Supp. 2d 465, 490

(S.D.N.Y. 2013) (parenthetically quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218,

105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)); see also WorldCrisa Corp. v. Armstrong, 129 F.3d 71,

74 (2d Cir. 1997) (same).

     Here, the Defendants move to stay the action pending the completion of the FINRA

arbitration. As the Court is satisfied that this suit is referable to arbitration to FINRA under Rule

13200(a), the Court grants the Defendants' application to stay this case.

## III. CONCLUSION

     For the foregoing reasons, the Court grants the Defendants' motion to compel arbitration

of the Plaintiffs' claims before FINRA and stays this action pending the outcome of the

arbitration.


**SO ORDERED.**
Dated: Central Islip, New York
March 31, 2016


                    _/s/ Arthur D. Spatt__
                     ARTHUR D. SPATT
                 United States District Judge